```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,            )  Criminal Action
                                     )  No. 21-640-1
vs.                                  )
                                     )
GEORGE AMOS TENNEY, III,             )  December 5, 2022
              Defendant.             )  2:08 p.m.
                                     )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE THOMAS F. HOGAN,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES:**</u>


```
FOR THE GOVERNMENT: ALEXIS LOEB
                    U.S. Attorney's Office
                    for the Northern District of California
                    450 Golden Gate Avenue
                    San Francisco, CA 94102
                    (415) 436-7168
                    Email: alexis.loeb@usdoj.gov


FOR THE DEFENDANT:  CHARLES WILLIAM COCHRAN,
                    Federal Public Defender
                    145 King Street
                    Charleston, SC 29401
                    (843) 727-4148
                    Email: charles_cochran@fd.org


ALSO PRESENT:       ROBERT WALTERS, U.S. Probation Office


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
```


```
              Proceedings reported by machine shorthand.
       Transcript produced by computer-aided transcription.
```

1                    **P R O C E E D I N G S**

2            THE COURTROOM DEPUTY:  Your Honor, this is

3    Criminal Matter 21-640-1, United States of America versus

4    George Amos Tenney, III.

5            Counsel, please come forward and state your

6    appearance for the record, beginning with the government.

7            MS. LOEB:  Good afternoon, Your Honor.

8    Alexis Loeb for the United States.

9            THE COURT:  Thank you, Ms. Loeb.  I appreciate you

10   coming in from California.

11           MS. LOEB:  Thank you.

12           MR. COCHRAN:  Good afternoon, Your Honor.

13   Charles Cochran, representing Mr. Tenney.

14           THE COURT:  Thank you, Mr. Cochran.  You are from

15   the District of South Carolina?

16           MR. COCHRAN:  Yes, Your Honor.

17           THE COURT:  I appreciate it.

18           And I see Mr. Tenney is here.  I am aware

19   Mr. Tenney has family in the courtroom, which is fine.

20           MR. WALTERS:  Good afternoon, Your Honor.

21   Robert Walters with probation.

22           THE COURT:  Thank you, Mr. Walters; I appreciate it.

23           We're here this afternoon for the sentencing,

24   according to Mr. Tenney's guilty plea, to Counts 1 and 2 of

25   the indictment charging him with civil disorder and

```
 1      obstruction of an official proceeding.

 2                Pursuant to the plea agreement, the government has

 3      agreed to request the Court dismiss all of the remaining

 4      counts of the indictment at the time of sentencing.

 5      Mr. Tenney has been on pretrial release.  He has been

 6      consistent and compliant with the terms of release.

 7                The issue for the Court, first, to talk about with

 8      counsel is the objection that remains unresolved to the

 9      enhancement added for the obstruction count to the

10      sentencing guidelines of eight points.

11                So I will hear -- Mr. Cochran, I want to address

12      that for a minute.  I will decide that.  We need to decide

13      that to decide what sentencing range is appropriate in the

14      case.

15                MR. COCHRAN:  Thank you, Your Honor.

16                May it please the Court.

17                When I came on the case, I decided to object to --

18                THE COURT:  We need you at the podium with the mic

19      so we can hear everybody.

20                MR. COCHRAN:  I'm sorry, Your Honor.

21                We decided to object to that 8-level enhancement

22      based on my conversations with Mr. Tenney, along with

23      viewing the video footage that the government provided of

24      the incidents, along with just a plain reading of the

25      8-level enhancement --
```

1              THE COURT:  Right.

2              MR. COCHRAN:  -- that the enhancement requires a

3     showing of a threat or actual cause of physical injury.

4              THE COURT:  Physical injury.

5              MR. COCHRAN:  And just going through a

6     step-by-step viewing of the video evidence, it's clear that

7     Mr. Tenney is in the crowd.  He enters the Capitol Building.

8     He goes into this Rotunda area and, all by himself, he

9     starts pushing against the doors.

10             You can sort of see through the small windows,

11    through the doors, a large crowd -- a chaotic scene between

12    the crowd and the Capitol Police.  He is unable to press the

13    doors open for a while; he does end up getting it open

14    slightly.

15             At that point, the gentleman referred to as J.G.,

16    who is a Sergeant at Arms, rushes toward Mr. Tenney; and

17    that's the first physical contact that Mr. Tenney has with

18    an employee that I am aware of.  So J.G. is right next to

19    Mr. Tenney.

20             It's clear that he's intending to get the doors

21    closed and that Mr. Tenney wants the doors open; they're

22    having an exchange of words.  But Mr. Tenney backs off at

23    the Sergeant at Arms' instructions, but then comes back over

24    to the doors.

25             Our viewing of that video -- and based on our

1    discussions with Mr. Tenney -- is that he is wedging his

2    body up against the doors.  He is not trying to injure the

3    Sergeant at Arms.  He is not trying to injure any of the

4    police officers outside.  And I don't think there is any

5    allegation that he does, in fact, cause any injury.  I know

6    there was some speculation on the government's part that he

7    may have pushed J.G. into the door jamb.

8                    THE COURT:  Right.  He says that --

9                    MR. COCHRAN:  And that is the defense position,

10   that that is not evident from the video.  I don't believe

11   that that is evident from his interviews later on.

12               I think a lot of the employees around the Capitol

13   have difficulty remembering every incident that occurred on

14   that day, certainly; and we understand that.

15               However, we do have a pretty clear video; and it

16   shows Mr. Tenney up against the door, pushing it open,

17   having a verbal exchange.  And then J.G. walks away from him

18   to deal with other people in the Capitol, it seems.

19               At that point Mr. Tenney is pressed against the

20   door, letting people in.  At one point, another protester

21   comes in and is visibly in distress; I don't know if it's

22   tear gas, or he got knocked on the head -- whatever -- but

23   he spends a lot of time laying down on the steps during the

24   rest of what happens.  It's just an example of what

25   Mr. Tenney -- I think what his intentions were when he was

1     down by that door.  He specifically helped that man in

2     through the threshold, out of the crowd.

3           It's evident that people were pretty violently

4     pressed up against that door because the windows had just

5     been smashed.  It's clearly very difficult to open the doors

6     because there are people pressed against them; they open to

7     the outward crowd.

8           Your Honor, I think the main part of the

9     government's contentions for the 8-level enhancement come

10    from Mr. Tenney's interactions with the person referred to

11    as B.A. who has a more protracted interaction with Mr. Tenney.

12          He comes in from the outside, and the government

13    characterizes it as "locking arms."  I think it's hard to

14    tell how exactly their bodies are situated, but he kind of

15    bursts in through because of the crowd; it seems like he's

16    propelled forward.  And he and Mr. Tenney -- Mr. Tenney kind

17    of backs up with him, and they're kind of holding each

18    other.  Mr. Tenney's codefendant, Mr. Youngers, comes up and

19    pulls B.A.'s arm off of his grasp of Mr. Tenney's shoulder,

20    his shirt.  They all separate after that.

21          From then on, what I think is important is what

22    the government states in its memo, is that B.A.'s

23    recollection of his interactions with Mr. Tenney are that he

24    is saying, "We are one of you," or -- he is saying "We're

25    one of you" -- meaning the protesters and the police.  I

1    think that that is just emblematic of the cognitive

2    dissidence that was going on in this crowd.  They really

3    thought or fancied themselves to be the supporters of law

4    and order when they were doing this.

5              And that, I think, will go to our presentation

6    later with Mr. Tenney on a personal level, on the reforms

7    that he's made based on his realizations of a lot of the

8    falsehoods that led to that day.  But it's important to the

9    8-level enhancement because it clearly demonstrates that he

10   is not there to hurt a police officer; he is not

11   antagonistic towards them on a personal level.

12             You know, I think Officer B.A. is certainly doing

13   his job; I don't think he does anything wrong.  And we

14   certainly -- Mr. Tenney certainly does not take that

15   position; he did not do anything wrong.

16             But you see on the video that, after he and

17   Mr. Tenney have this exchange, Mr. Tenney continuously goes

18   up to him.  And I think what he is saying to him is, you

19   know, "Look, we are one of you."  We're not trying -- we're

20   not trying to have a violent confrontation; we just are

21   trying to demonstrate.  As ridiculous as that position may

22   have been -- and as justified as B.A. may have been in his

23   actions towards Mr. Tenney and the others -- it does go to

24   show that Mr. Tenney's physical contact with him was not

25   intended to cause physical harm.  It didn't cause physical

1    harm, and it was not threatening.  He is trying to explain

2    his position to Officer B.A.

3                THE COURT:  What about Officer J.G.?

4                MR. COCHRAN:  J.G., the Sergeant at Arms in

5    plainclothes?

6                THE COURT:  Capitol Police Officer J.G. entered

7    the east foyer, the defendant, Tenney, grabbed -- pushed him

8    to the side.  That's about the time Officer B.A. was in the

9    doorway, and a rioter grabbed Officer B.A. and threw him to

10   the ground.

11               MR. COCHRAN:  Right.  So I believe -- if I am

12   correct in what you are referring to, there are two J.G.s.

13   I think there is one J.M.G.  There is another officer, also

14   in riot gear, that comes in through the outside.

15               Mr. Tenney -- after the doors had been opened and

16   B.A. was struggling, with other officers, Mr. Tenney -- you

17   can see him kind of placing his hands on a number of

18   demonstrators -- as they're coming in, he is putting his

19   hands on their shoulders.

20               There is clearly an instance where an officer in

21   riot gear kind of stumbles in or walks in; Mr. Tenney pushes

22   him to the side.  It does not appear to be the kind of

23   physical contact that could cause physical injury.  I don't

24   think that it was a threat to cause physical injury and

25   would not rise to what would be required to show an 8-level

1     enhancement and what comes along with that.

2             THE COURT:  Your attack -- not your "attack" --

3     your challenge to the assessment of the 8-point enhancement

4     is more directly to the circumstances of Mr. Tenney's

5     conduct as it could apply, as opposed to the overall idea of

6     attacking the concept of the certification of the Electoral

7     College involving the administration of justice, or you are

8     attacking on both grounds?

9             One, that the count -- it just couldn't simply

10    apply in this kind of situation; and, two, that whatever --

11    if it does apply, that Mr. Tenney didn't meet the

12    requirements of any kind of physical injury or

13    threatening --

14            MR. COCHRAN:  Your Honor, certainly our focus --

15            THE COURT:  -- or damage to property?

16            MR. COCHRAN:  I'm sorry.

17            Certainly, our focus is on Mr. Tenney's specific

18    conduct, in terms of his actual interactions with officers

19    that day.

20            Now, I don't think that there is any indication

21    that he acted in any way on that day specifically to affect

22    the process.

23            Now, it's my understanding from -- I was not

24    representing Mr. Tenney at the time of the plea -- at the

25    guilty plea and the plea agreement that he entered into.  I

1    did feel that he had made some admissions regarding

2    knowledge of the nature of the proceedings, the effect that

3    the demonstration was having on that as a whole.

4         I will say to that point, though, that there is no

5    indication that Mr. Tenney was -- like a lot of other folks

6    that I saw on the news -- running up into the chamber areas,

7    asking for specific lawmakers, demanding to know where they

8    are, putting their feet up on their desks, those kind of

9    things, or going up to the actual Speaker's podium.  He was

10   not involved in any of those things, so I don't think -- I

11   don't think that there is --

12        THE COURT:  Well, he was involved in allowing a

13   number -- perhaps dozens -- of rioters into the Rotunda area

14   that subsequently caused damage.

15        MR. COCHRAN:  Yes.  And he fully admits that he

16   was a very active participant in the January 6th -- and he

17   pled guilty to a felony count.  He did receive a very harsh

18   consequence already for what he admitted to.

19        But specifically as to that 8-level enhancement,

20   we did feel that that was not appropriate based on just a

21   commonsense viewing of the videos and what Mr. Tenney was

22   doing in there, and also related to other people who were

23   similarly situated to him.

24        We acknowledge that Mr. Tenney and Mr. Youngers,

25   his codefendant, did have different conduct, and that

1    Mr. Tenney's physical contact with officials or with police

2    officers was more than what Mr. Youngers did; and that's

3    reflected in the gravity of their convictions.  But I don't

4    think -- the defense position is that the difference between

5    the two does not rise to the level of such a harsh

6    enhancement which -- I mean, I think it goes to the

7    difficulty of applying the laws that had already been on the

8    books prior to something unprecedented.

9              THE COURT:  Right.

10              MR. COCHRAN:  This seems, when you read it, to be

11    a law designed to protect witnesses in an upcoming judicial

12    process, threats against them, intimidating people, harming

13    people who are going to be witnesses in criminal cases.  In

14    that sense, I do think that it is trying to fit a square peg

15    into a round hole; that Mr. Tenney is certainly caught up in

16    the moment; certainly an active participant in January 6;

17    but very, very misguided as to what he thought was the

18    relationship between himself, his fellow demonstrators, and

19    the police who were protecting the Capitol that day.

20              I think that he had some irrational beliefs as to

21    who was on whose side that day.  I don't think that there is

22    anything in the record to reflect that he was antagonistic

23    or vengeful against those officers, that he was -- he did

24    have incidental, physical contact with them in a very

25    crowded, chaotic place.

1        THE COURT:  All right.  Let me address the

2   government --

3        MR. COCHRAN:  Thank you, Your Honor.

4        THE COURT:  Because, under the sentencing

5   procedure -- so the people who are here understand -- we

6   have to determine the sentencing guidelines first.  Once we

7   find out the guidelines, then we can discuss the appropriate

8   sentence.  The Court has to determine what the guideline

9   range should be.

10        Right now, we have a total of either 17 to 25, and

11   that results in substantially different sentences that are

12   possible in the case depending on -- well, I'll give credit

13   for accepting responsibility.  It would be the 16 to 22

14   range; one is a 21- to 27-month range, and the other is a

15   41- to a 51-month range.

16        Let me hear from the government about the overall

17   approach of using this enhancement for this type of activity

18   as a judicial -- interference with a judicial matter and

19   administration of justice, causing threatening or physical

20   injury to a person, and whether the specifics of this case

21   fit that in any event.

22        I am aware that the judges of this district have

23   addressed this before.  We have got one judge who has

24   disagreed; the others all have agreed with the government's

25   position in this case.  I have seen it so far -- I think

1   six, probably seven different judges.

2          MS. LOEB:  Yes.  And I think since we filed our

3   memo, Judge Mehta also agreed that this enhancement could

4   apply to the certification of the Electoral College vote in

5   the *Wood* case.

6          Does Your Honor have --

7          THE COURT:  Well, this description of how it

8   specifically applies here to what Mr. Tenney was alleged to

9   have done with officers causing physical injury and how he

10  would have -- fits underneath the 8-point enhancement then.

11         Assume, for a minute, that the generic enhancement

12  applies to the certification of the Electoral College as

13  part of the administration of justice broadly defined in the

14  guidelines, where statutory interpretations are made, and if

15  it could fit this type of activity we had here.  Of course,

16  the other judges have determined that except Judge McFadden.

17         But how does that apply specifically to the

18  defendant's own actions and admissions of what he did, as

19  described by his counsel just now, on the videos which I

20  have watched, where he is allowing people to come into

21  the -- allowing rioters to come into the Capitol?

22         MS. LOEB:  Yes, Your Honor.

23         First, I just want to remind the Court of the

24  standard here, which is a preponderance standard.  What the

25  Court needs to find is that Mr. Tenney caused or threatened

1    injury or property damage, and it doesn't need to be:  Does

2    every single one of Mr. Tenney's actions cause that?  But

3    looking at this course of conduct, can the Court find that?

4              I don't think that it's a difficult decision here

5    because, first of all, we look at Mr. Tenney's --

6    Mr. Tenney's physical conduct.  So we have the physical

7    contact with three officers; and I have the videos, so I can

8    pull up the freeze-frame.

9              The first -- with House Sergeant at Arms J.M.G.,

10   first Mr. Tenney has -- Mr. Tenney tries to open the door.

11   His first attempt he can't because it's a magnetic lock;

12   there is a time delay.  After a certain number of seconds

13   later, he can push open the door.  He is able to push open

14   the door.  When Mr. Tenney does that, there aren't people

15   pressed right against the door; you can see that through the

16   window.

17             So then J.G., the House Sergeant at Arms, runs up

18   to Mr. Tenney, pushes him out of the way.  Mr. Tenney comes

19   back, and he gets in J.G.'s face; he's jabbing his finger at

20   him, which alone is a threat.  And then, at 32 seconds into

21   the video, he pushes the officer into the door frame.

22             So that -- I mean, I think in that moment,

23   Mr. Tenney -- frankly, throughout this interaction,

24   Mr. Tenney is so focused on getting the doors open to serve

25   what he sees as a revolution; he thinks the country is under

1    threat.  It is of vital importance to him, and he is not

2    going to let an officer stand in his way.  So he pushes --

3    he pushes J.G. into the door frame.

4         The other physical contact we have described, he

5    ends up with his arms locked with B.A.'s outside.  I can't

6    tell who grabbed who first, so that's why we described them

7    as locking arms.  They walk in together, he pushes B.A.

8    away.  As Your Honor noted, then we have another Capitol

9    Police officer, J.G., come through the door, and he shoves

10   him to the side into another rioter.  Shoving an officer and

11   changing his course of travel like that, especially when you

12   are pushing them into someone else, in a crowded area like

13   that, of course that's the kind of action that threatens to

14   cause injury.  Those are just some of Mr. Tenney's actions.

15        Under the sentencing guidelines, Your Honor is

16   also allowed to look at the actions he aided or abetted or

17   jointly undertook in criminal activity.  And I think, here,

18   one of the clearest examples comes when -- at about 2:28

19   into Government Exhibit 1.  Tenney, again, has approached

20   the Rotunda doors.  With some of the rioters, he's throwing

21   his body weight into it to try to open it.  Officer B.A. is

22   struggling against them, and he's focused on that door.  And

23   in that moment, there is another rioter who is able to come

24   up behind Officer B.A., grab him by the shoulder, and throw

25   him to the ground.  It's an incredibly violent moment, and

1      Mr. Tenney is -- it is completely -- Mr. Tenney has played a

2      role in it because he is trying to shove the door open and

3      so Officer B.A. is focused and fighting against them and is

4      then left vulnerable to an attack from behind.

5           I think you can -- it's also fair to look at -- I

6      think it's also completely foreseeable to Mr. Tenney, when

7      he opens the door and allows 50 rioters to enter, what some

8      of those rioters might do inside and what some of those

9      rioters did do inside.  One of those rioters is the rioter

10     who threw Officer B.A. to the ground.

11          Another rioter woman, Audrey Southard-Rumsey, went

12     on to commit three -- sorry -- four more assaults inside the

13     Capitol Building; and this is completely foreseeable to

14     Mr. Tenney because he has been outside; he climbed a wall to

15     get into the Capitol.  He has seen people throw things at

16     officers outside the parliamentarian doors, a confrontation

17     he joined in.  And then he goes inside and he has seen this

18     violence against the police at the Rotunda doors; so that's

19     yet another basis to apply the enhancement.

20          And I think, Your Honor, the enhancement also

21     applies based on the threat to cause property damage.  You

22     have -- at least four times Mr. Tenney is going up and

23     throwing his weight against the Rotunda doors when they're

24     not opening; and continuing to do that, I think, it

25     threatens to jam the door which could also cause property

1    damage.

2          Defense counsel mentioned -- I think you know,

3    defense counsel has referred to Mr. Tenney's intent.  I

4    think that description of "intent" is not consistent with

5    the video evidence.  And then, when you consider

6    Mr. Tenney's words, it's even clearer.

7          So just one other point I want to make about video

8    evidence is that defense counsel mentioned a moment where

9    there is a rioter who needs to go sit down at the stairs and

10   recover; I think that that is at about 2 minutes and 42

11   seconds into Government Exhibit 1.

12         There is this rioter who is sort of in the door

13   and, basically, kind of runs into Tenney.  What is Tenney's

14   reaction?  It's not to go help the rioter go sit down at the

15   doors and kind of attend to him and make sure he is okay.

16   Tenney -- the guy has run into Tenney, Tenney just kind of

17   lets him go behind and go sit down; and Tenney returns his

18   focus to Officer B.A.

19         So the point is that if Tenney's real focus is

20   diffuse the situation, make sure everyone is okay, you would

21   expect him to respond differently in that situation.

22         Looking at Tenney's words, defense counsel

23   mentioned Tenney saying, "We are one of you."  That is not

24   Tenney gently going up to an officer and saying:  Hey, we're

25   one of you; we're here to help.

1    Tenney points at that officer and says:  We are

2    one of you.  He says it so forcefully, the implication is:

3    We know what is best; we are the ones in control here; you

4    need to stand aside.  That statement is not mitigating; that

5    statement is actually a threat.

6    The other things we hear Tenney say are:  Stand

7    up, patriots; stand up.  He wants other people to join him

8    in what he sees, frankly, as a civil war, as a conflict, as

9    a violent conflict.  We don't hear Tenney saying anything at

10   the moment -- in the moment about helping people, about

11   calming down.  Again, the evidence is just totally

12   inconsistent with that.

13   By the way, when the FBI first approached Tenney

14   in early 2021, he didn't tell the agent that he was there to

15   help rioters.  He gave other self-serving excuses.  He said

16   he was helping fallen officers to their feet.  But he did

17   not -- this explanation that Tenney was helping people who

18   were crushed against the doors, helping injured rioters

19   inside, that is not something that emerged until well after

20   he had to confront the video evidence in the case.

21   I think what else informs the Court's

22   understanding of Tenney's intent -- not just the words he

23   said at the time -- but the words he said leading up to that

24   day.  For weeks Tenney had been talking on social media, and

25   he had become convinced that America was in a struggle for

1    its very survival.  He was prepared for violence.

2              At one point he talked about needing to bring an

3    AR.  And I think you see in Tenney's own letter to the

4    Court, he admits he was embroiled in all sorts of conspiracy

5    theories; that helps the Court understand his mindset.  The

6    question isn't what is Mr. Tenney's mindset today.

7              What was his mindset on January 6th?

8              He said there would be a revolution if the

9    election didn't go his way.  He said:  Where do I get

10   involved in one of these patriot revolution groups, like the

11   Proud Boys or any other American patriot militia.

12             I mean, as recently as January 5th, he was asking

13   for information on militia groups, which helps the Court see

14   that his intent that day, he was very much -- he was ready

15   to fight; he wasn't going to let officers stand in his way.

16   He said:  It's starting to look like we may siege the

17   Capitol Building and Congress if the electoral votes don't

18   go right -- which is one of the clearest expressions of

19   intent that I think I have seen in any of these cases.

20             He thought the U.S. was entering a war.  He said:

21   Pence is a traitor and will betray the U.S. on the 6th.

22   Biden will go in.  They are -- then:  Long story short,

23   country goes into the schedule of domestic war and siege.

24   That's what he thought was happening on January 6th, and

25   that's what he thought he was taking action to stop; that

1    was his mindset.  He thought America was in a struggle for

2    its life, and he was not going to let a couple of officers

3    stand in his way.

4              THE COURT:  All right.  Thank you.

5              The Court is going to make a ruling at this time

6    on the objection to the presentence report by counsel for

7    Mr. Tenney.  I have discussed it with counsel on both sides,

8    and I have reviewed the objection under the guideline; it's

9    1B1.3(a)(1)(A) that we have been discussing.

10             The Court is convinced that the 8-level

11   enhancement called for by probation and the government

12   should apply here.  It's supported by the weight of

13   authority by other judges in this Court as well as the facts

14   and the circumstances of this case, after considering the

15   arguments of counsel; and I have reviewed the videos

16   previously.

17             The generic approach overall, first, is the -- can

18   it apply, because this enhancement -- it could be defined as

19   something involving the administration of justice.  And it

20   is obvious to me that -- similar to the motion to dismiss

21   Count 1, the obstruction count; but it can be broadly

22   defined in the guidelines and by the courts before, that the

23   enhancement could apply to obstructive behavior on

24   January 6th.

25             But what the issue really is here -- I

1    believe from his counsel -- is that it doesn't apply here

2    because of the facts, that he didn't cause or threaten to

3    cause physical injury, and that -- I think he agreed to the

4    3-point enhancement, under the guideline at 2J1.2B2, because

5    the event resulted in -- substantial interference with the

6    administration of justice could be applied; that's in the

7    plea agreement actually.  But it's obviously based on --

8    Mr. Tenney's actions did interfere with the administration

9    of justice, that is, during the vote of the Electoral

10   College; and it was planned to do that.

11          The government has pointed out -- and there are

12   other postings by Mr. Tenney before the riot began -- that

13   he was coming up to stop the Electoral College vote from

14   going forward.  That was the purpose of the riot, the

15   purpose of the attack planned by various people; and that he

16   had circulated notes about that himself on his media, on the

17   internet.

18          His actions specifically as to interfering with

19   the administration of justice, it did so.  And it certainly

20   seems to me, by that interference, that means he obstructed

21   the administration of justice, and that he allowed rioters

22   to come into the Capitol that could not otherwise have

23   gotten in -- by his actions -- that then caused further

24   destruction and damages -- physical and property damages --

25   that got in due to his strong efforts.  His efforts

1    certainly consisted of causing or threatening to cause

2    physical injury and, essentially, property damage as well.

3           The question about what he did and trying to,

4    basically, interpret the video clips -- but there is no

5    question that he was in contact with the police officers,

6    there was physical contact; that his mannerisms were

7    threatening; his intent to continue to go back to push the

8    doors open to let more people in; he's encouraging the

9    rioters to come in, patting them on the back -- it seems it

10   all amounts to, certainly, sufficient evidence by a

11   preponderance of the evidence that the 8-level enhancement

12   to the offense level can apply to Mr. Tenney's behavior

13   charged in Count 2; so I think we're going to go with that.

14          I have found that the 8-level enhancement -- then

15   the overall offense level would be 22; that's a guideline

16   range of 41 to 51 months in prison.

17          I don't see any other objections to the report at

18   this time.

19          Now, as to the sentencing, at this time we have to

20   do the following -- now that I have determined the guideline

21   range -- we have gotten a presentence report from the

22   presentence report writer who is here in court today; he has

23   introduced himself to the Court and to the parties; that's

24   Mr. Walters.  I have reviewed the presentence report with

25   him and I have discussed it with him, as is my practice

1    prior to the sentencing.

2         Additionally, I have received the letters and

3    materials in support of Mr. Tenney through his counsel, and

4    his memorandum and amended motion in opposition to the

5    presentence report; the sentencing memorandum motion for a

6    variance, and a supplement to the sentencing memorandum as

7    well.  I have received and reviewed the government's

8    memorandum as well as to the sentencing that they think

9    should be imposed.

10        On the materials I have reviewed for Mr. Tenney

11   was his own lengthy report to me of his situation and his

12   feelings and his regret of what happened and is sorry that

13   he got involved in this matter -- quite lengthy, interesting

14   material that he sent from his background and work, and the

15   changes he has had in his life since this happened.

16        I have received a letter from his mother who is

17   very supportive of him, and the situation he finds himself

18   in at this time.  I have letters from a couple of friends

19   that are on the record as well -- who know him well and

20   vouch for him and his family -- and the concerns they have

21   for him.

22        I have reviewed all of those.  So that is what the

23   Court has seen.

24        I think what we need to do is hear from his

25   counsel again as to his rationale for the kind of sentence

1     he has asked for Mr. Tenney, and then I will hear from the

2     government their position -- and, finally, I will hear from

3     Mr. Tenney himself in this matter.

4            Mr. Cochran, do you want to explain to me why we

5     should vary from the guidelines and give a lesser sentence

6     in the matter?

7            MR. COCHRAN:  Yes, Your Honor, if it pleases the

8     Court.

9            Would you like Mr. Tenney to stand up here with me?

10           THE COURT:  He can come up later if he wants to

11    talk; unless you want him here now, that's fine.

12           MR. COCHRAN:  Thank you, Your Honor.

13           Your Honor, I think what is most important for

14    someone like Mr. Tenney, who participated in this January 6

15    activity, is that he has genuinely reformed his outlook.

16           He does not see himself as a persecuted person.

17    He doesn't see himself as having been on the right side of

18    history and now is receiving his comeuppance; that's not how

19    he sees it.

20           I think that after -- when I spoke to him, that

21    was the thing I was most interested in:  Where did you kind

22    of make that turn?  And he told me that some of the

23    podcasters that he was listening to kind of got exposed for

24    having more monetary motivations than political motivations;

25    but then, also, when the challenges to the election started

1    getting rejected by the courts.

2           I think that gradually Mr. Tenney had an "emperor

3    has no clothes" realization moment where everything kind of

4    fell apart for him; his world outlook that led him to D.C.

5    on January 6th fell apart.

6           Since that time, as we noted in the presentence

7    report, he lost a really good job.  He was making good money

8    with Sysco, the food supply company.

9           THE COURT:  The food supply company, right.

10          MR. COCHRAN:  He had health care for his family;

11   he had a retirement plan.  He was fired immediately after

12   getting arrested for this.

13          As Your Honor sees, his fiancée is here in court

14   with their infant child.  He also has two other children

15   under the age of ten that he shares custody of with his

16   ex-wife.  He supports them financially, but he also takes

17   them half the week.

18          He is, right now, running a small takeout

19   restaurant in South Carolina to try to support his family;

20   it's obviously much, much more difficult since losing that

21   job and the career opportunities that he had built up for

22   himself by being a high-level chef for almost two decades.

23          He has received immense consequences; he has taken

24   on a felony conviction.  And we understand the Court's

25   ruling with regard to the enhancement.  I think it is still

1    relevant to sentencing, though, to take into account his

2    actual actions in the Capitol that day, especially as they

3    relate to other defendants; in particular, his codefendant

4    who did receive some deference from the government pleading,

5    I believe, to a misdemeanor count and getting a probationary

6    sentence.

7           And in our reply to their sentencing memo, we

8    pointed out some of his behaviors that were similar:  The

9    screaming of profanity; that, "This is what a revolution

10   looks like"; picks up a piece of broken glass.  And clearly,

11   in the video, grabs B.A.'s arm as well.

12          We fully acknowledge that they have different

13   levels of conduct, but those have already been reflected in

14   the different levels of their convictions and, certainly, in

15   the stress of coming up here before Your Honor in person

16   today, rather than by video, with these kinds of guidelines,

17   having three young children.

18          Your Honor, that in itself, I think, speaks to

19   Mr. Tenney.  He put on a suit and drove eight hours to be

20   here in front of Your Honor today.  And he understands the

21   gravity of what it means to be here in front of Your Honor

22   today, in a courthouse that I'm surprised to see how close

23   it is to the Capitol Building.  I am not very familiar with

24   this city --

25          THE COURT:  My chambers overlooks the Capitol.

1    MR. COCHRAN:  Yes, Your Honor.

2         Oddly enough, the view from my hotel building had

3    the Capitol in it looking back at me last night.

4         So the gravity of all of this is not lost on the

5    defense or Mr. Tenney or his family.

6         Your Honor, his mother and his fiancée also made

7    the trip to be here in support of him today.  You did

8    receive a letter from Mr. Tenney which he wrote before I

9    even started representing him.  He is profoundly remorseful

10   for what he did, and I think really understands just how

11   wrong he was in his acts that day.

12        I believe he would like to address Your Honor.

13        THE COURT:  I think I will hear from the

14   government first, and then I will have Mr. Tenney -- have

15   him -- give him a last chance to speak to me before I make

16   the final decision.  Thank you.

17        I will hear from the government as to this matter.

18        We have the guideline sentence.  Now that I have

19   determined the range, let's see where we go from that.

20        MS. LOEB:  Your Honor, I don't have a view of the

21   Capitol from my hotel room; it looks out at a wall.  But

22   what I do have is a little bit of experience now working on

23   various January 6th cases.

24        While the government believes that every rioter in

25   the building contributed to the damage of the riot and made

1    it worse, Mr. Tenney's case really stands apart.

2            It is -- Mr. Tenney -- compared with other

3    rioters -- made the situation dramatically, dramatically

4    worse.  We really can't understate the importance of opening

5    the Rotunda doors; one of the two major breach points into

6    the Capitol.

7            Mr. Tenney was the person who first opened those

8    doors.  And then, when people tried to close the doors --

9    when officers tried to close those doors, he went back again

10   and again to fight to keep them open.  He allowed,

11   approximately, 48 people to enter just during that breach.

12           But you know what happened outside the doors when

13   they opened, the crowd outside cheered.  And I think it's

14   fair to say that even beyond those 48 people who entered the

15   Capitol, some of whom went on to destroy property and

16   assault officers, everyone outside saw that this riot might

17   work, that they might be able to get inside, that they might

18   be able to get to Congress.  So when officers succeeded in

19   closing the doors, that didn't last very long.  After about

20   15 minutes, they were breached again, and even more people

21   were able to enter.

22           Mr. Tenney's actions in breaching the doors made

23   the situation much, much more dangerous and really

24   distinguishes him from many of the other January 6th cases.

25           What also, of course, distinguishes Mr. Tenney is

1     his physical contact with the officers, his willingness to

2     physically confront them, which Your Honor already found

3     supported the 8-level enhancement.

4          Many judges have said that the higher sentences

5     should be reserved for those who had -- who physically

6     confronted officers; and Mr. Tenney is one of those people,

7     and he is in that category.

8          In terms of Mr. Tenney's history and

9     characteristics, Mr. Tenney's letter where he notes that he

10    had fallen prey to all kinds of theories -- I do want to

11    point out that I think that also causes some concern that he

12    could fall -- I mean, social media is just ubiquitous in

13    modern life.  And we -- the government appreciates that he

14    has recognized that those conspiracy theories were not

15    well-founded, but the government is concerned that there

16    could be other theories or some other topic again, in the

17    future, that he could kind of fall under the spell of.

18         I think, also, the other point about the depth of

19    the conspiracy theories is that it shows, on that day, just

20    how violent and angry he was; that he was filled with these

21    beliefs that then he acted out, and it just helps

22    demonstrate on that day how aggressive and violent he was.

23         I wanted to talk briefly about disparities.  First

24    of all --

25         THE COURT:  They raised that with Mr. Youngers'

1    situation.

2          MS. LOEB:  Yes.  They also, I believe, raised the

3    *Wood* case where Judge Mehta gave home detention in a 1512

4    sentence last week.

5          In that case, Judge Mehta did not apply the

6    8-level enhancement, so the guidelines range was different.

7    And Judge Mehta specifically found there the defendant did

8    not have that kind of physical confrontation with officers;

9    that he wasn't pushing back on officers in the Rotunda as

10   the government had asserted.  That defendant was also

11   23 years old; Mr. Tenney is much older and knew better, and

12   did have those kinds of physical confrontations.

13         In terms of Mr. Youngers -- I was part of that

14   sentencing.  And I think Mr. Youngers successfully persuaded

15   the Court that he -- while he was all fired up when he

16   entered the Capitol, that kind of dissipated when he got to

17   the area by the Rotunda doors.  And there -- he was actually

18   acting to defuse the situation; where Mr. Tenney was doing

19   the opposite.

20         So in Government Exhibit 1, 44 seconds in, while

21   Mr. Tenney is arguing, jabbing his finger at J.G. of the

22   House Sergeant at Arms, Mr. Youngers is pulling a sign out

23   of the way so that the two men don't run into it.  We see

24   Mr. Youngers trying to intercede, to separate Tenney from

25   Officer B.A.  When Mr. Tenney goes back to get in B.A.'s

1    face, Youngers hangs back.

2              I think one thing that was significant for the

3    Court is that -- when Officer B.A. is up trying to fight for

4    the doors and ends up struggling with Tenney over them

5    again, another rioter puts a bench so it's right behind

6    Officer B.A., and his radio gets tangled up in it;

7    Mr. Youngers actually goes, untangles the radio, and pushes

8    the bench out of the way which, I think, was an example of

9    Mr. Youngers, in that situation, taking more actions that

10   reflected a desire to diffuse, diffuse tensions or keep

11   officers safe.

12             And then, of course, Mr. Youngers kept Tenney back

13   and kept other rioters back from Officer B.A. after he had

14   been thrown to the ground.  Then, when Mr. Tenney again goes

15   to the door and is struggling with officers over it again,

16   Mr. Youngers, again, is kind of in the back.  He is filming,

17   and he finally goes up to Tenney and pulls him away from the

18   confrontation.

19             So while Mr. Youngers had these -- climbed a wall,

20   like Mr. Tenney, and had these inflammatory statements, when

21   he got to the Rotunda doors the conduct was very different;

22   and that's exactly -- that conduct is what is so serious

23   about George Tenney's case; struggling to open the doors

24   repeatedly and fighting with officers.

25             In addition, there is no evidence -- the

1    government didn't present any evidence of Mr. Youngers'

2    intent going into January 6th.  And the statements I read

3    before show that Mr. Tenney was aware of violence, was

4    interested in joining a militia group; was aware of talk of

5    seizing the Capitol; had thought about bringing guns to D.C.

6    So there is a lot more we know about Mr. Tenney's mindset,

7    his desire to stop the Electoral College vote count, and his

8    willingness to participate in violence.

9           We would also, of course, ask the Court -- in

10   considering disparities -- to weigh all of the cases cited

11   in the government's memo.  And those cases, I think, suggest

12   that a sentence that's much lower than what the government

13   recommended would create a disparity.

14          Joshua Pruitt who got 55 months, who was convicted

15   only of a 1512 and didn't actually touch an officer; Greg

16   Rubenacker got 41 months, who also had no actual -- didn't

17   actually physically struggle with police the way Mr. Tenney

18   did.  Neither of these defendants helped dozens of people --

19   dozens of rioters enter the Capitol.  Christian Secor who

20   got 42 months also had no direct violence against law

21   enforcement.  And the three -- four defendants who were

22   convicted of 111 and 1512 got between 41 and 51 months, and

23   none of them opened the doors to allow dozens of other

24   rioters to enter the Capitol; none of them made the

25   situation dramatically worse, the way Mr. Tenney did.

1          So we credit -- we do credit Mr. Tenney's remorse

2     today.  But I think, in this case, the seriousness of the

3     offense, the dangerousness of opening the Rotunda doors, and

4     the need to send a message about that is just so important

5     that I think it outweighs the remorse.  It is --

6     Mr. Tenney's conduct, the lawlessness, and the disrespect

7     for democracy that it represents in his specific case, I

8     think, the seriousness of the offense and the need for

9     general deterrence require a guidelines sentence here.

10          Thank you, Your Honor.

11          THE COURT:  All right.  Thank you very much.

12          Mr. Tenney, come up, sir, with your counsel.

13          Having heard from Ms. Loeb, on behalf of the

14     government, and your counsel, I would like to discuss with

15     you your situation.

16          You obviously recognize the gravity of this

17     occasion.  You are subject to a substantial sentence in

18     prison by your actions to which you've pled guilty and have

19     acknowledged your wrongdoing before this Court, in

20     conducting, aiding and abetting the riot that occurred at

21     the Capitol on January 6th.

22          So I have reviewed everything in the file that was

23     given to me, your history and background, your family

24     situation, your two children which you care for a lot, your

25     new child.  You have been working -- you have a career as a

1    chef apparently -- a well-known chef in your community and

2    also had, obviously, a business in the food service industry

3    with a major company that does that -- procuring food and

4    delivering it -- that you have lost.

5            You have no real criminal record at all.  You have

6    not been a problem in the past.

7            You got heavily involved, unfortunately, in the

8    internet materials before the riot and encouraged others to

9    go -- and yourself -- to go to the riot, to attempt to take

10   over the federal government and the operations of Congress

11   in certifying the Electoral College vote.  I have reviewed

12   the videos, and what you did personally.

13           I also saw, in the background, that you are a very

14   good musician, although you aren't playing as much as you

15   used to, apparently, because of your requirements to work

16   and run the restaurant.

17           Let me hear from you.  I have got to say, I did

18   read your letter; I think it was a heartfelt, serious

19   letter.  You have run into a lot of difficulties subsequent

20   to this and apparently didn't consider all the problems that

21   could occur by your actions when you did come up here.

22           Let me hear from you, what I should consider about

23   your situation.  I have, obviously, looked at the nature and

24   circumstances of the offense.  I have looked at the

25   guidelines.  I have looked at the history and

1  characteristics of you and your family, the need for -- the

2  need for the sentence to be imposed for deterrence of

3  others, as well as to avoid unwarranted disparities.

4          Let me hear what you want me to consider.

5          THE DEFENDANT:  Yes, Your Honor.

6          I just want to start by saying I take

7  responsibility for what I did.  I understand that not only

8  the actions I did personally at the door were hindering of

9  government proceedings and stuff, but it also led to the

10  bigger picture of, you know, January 6th as a whole caused

11  law enforcement to get hurt, caused other people to get

12  hurt.  It was much more than just what happened in my stint

13  of being in the building.

14          You know, I did get caught up in what the

15  President was saying at the time.  I did get caught up in

16  all of this crazy stuff going on, whether it was corruption

17  in government or, you know, China involved in this, or

18  election fraud -- all of these different things that were

19  being thrown around at that time; and it did, you know,

20  cause fear and anger inside of me for the country.  You

21  know, I do love the United States; I respect law

22  enforcement.

23          But my mindset going -- my mindset going to D.C.

24  was fear of my children growing up, you know.  I have never

25  heard things like that before; I have never experienced

1    things like that before.  I have never been involved in

2    politics or cared at all about this, but these were all

3    things that were being said on a daily basis and things that

4    we were seeing every day online.

5            When I said things like the Capitol -- we this,

6    and we that -- it wasn't me personally in my group and my

7    friends or whatever it was.  It was people that felt the

8    same that I did or feared the same things as I feared.  You

9    know, folks that seemed concerned about the same things that

10   I did and saw and was concerned about.

11           When I went into the building that day, not at all

12   did I want to fight anybody; not at all did I want to get in

13   confrontation with cops.  I have never been disrespectful to

14   policemen on any level.  I did open that door, but it was

15   because, when I walked into the Rotunda, they were pounding

16   and screaming for help.  I had no -- my mindset wasn't:

17   When I open these doors, it's going to let so many more

18   people in to cause more harm and damage.

19           My initial thought was -- these folks right at the

20   door -- you could see it.  They were pressed and smushed

21   [sic]; they were crying, there were tears.  You know, they

22   were struggling for help, and that's why I was so hard about

23   trying to get this door open.

24           The first person that works there screamed from

25   the top level.  And I was telling him -- I am like:  They're

1    screaming for help; you know, look at them.  They're getting

2    slammed against the door; they're getting smushed, they

3    can't breathe, this and that.

4         When the officer in the riot gear showed up --

5    when I was face to face with him, I was telling him:  I am

6    not here to fight you; I am not here to do anything to you,

7    you know.  And that's when I was like:  I am one of you.  I

8    said that because I am thinking:  You must love your country

9    like I love my country.  Are you not scared of these things

10   that are being brought forth?  He said:  I am just trying to

11   do my job; just help us do our job and get out of here.

12   That's all the face-to-face contact was.  I was not trying

13   to threaten him.  I didn't want to do any harm to any police

14   officer at all.

15        Ever since then, like he stated, I lost my career;

16   I lost my income.  I originally tried to get a job in the

17   same type of corporation; nobody is going to hire me, not

18   only for what I did, but for the future consequences.

19        I have struggled to maintain my bills and my

20   family.  I had to cash out 401(k)s and retirements.  And I

21   was lucky enough to find the opportunity to run the business

22   that I am in now; and it's enough for our family, but things

23   won't be the same.

24        MR. COCHRAN:  Your Honor, I know that his mother

25   submitted a letter to you; she is in court here in support

```
 1    of him today.
 2              THE COURT:  Yes.
 3              MR. COCHRAN:  But his fiancée did not have a
 4    chance to write a letter, but she did travel.  I think she
 5    wanted to say a few words.  Should she speak from the
 6    lectern?
 7              THE COURT:  Well, we can't hear from back there.
 8    She is going to have to come up here and try to keep the
 9    baby quiet.
10              THE DEFENDANT:  I can tell you right now, I will
11    never make this mistake again.  I will never care about
12    politics again.  I have realized there is nothing one person
13    can do -- there is nothing a million people can do; you have
14    got to focus on you and your family.
15              MS. McCARSON:  Good afternoon, Your Honor.
16              How are you?
17              THE COURT:  Good afternoon.  All right.
18              Please introduce yourself for the record.
19              MS. McCARSON:  I am Amanda McCarson, George
20    Tenney's fiancée.
21              THE COURT:  Thank you, ma'am.
22              MS. McCARSON:  I didn't know George January 6th; I
23    only knew George from the beginning of May 2021.  From what
24    I know of him, he is kind, loyal, hardest-working man I have
25    ever met.
```

1    We have accomplished a lot together.  We bought a

2    restaurant, had a baby.  Planned to get married at the

3    beginning of the year.  Hopefully, build our dream home for

4    our three kids in the beginning of 2022 -- near the end.  He

5    has shown me time and time again that he is always there for

6    us no matter what; works from morning to night, six days a

7    week; you know, being at all of our kids' events, being

8    there for every doctor's appointment.  I mean, he goes above

9    and beyond for us every single day.

10    I know if he could go back to that day he would

11    have never left home.  I wish I knew -- I wish I would have

12    known him at that time and, you know, talked some sense into

13    him -- whatever, but I didn't know him at that time.  But

14    the man I know today regrets it, and feels extremely

15    sorry -- not only for what he did for people that got hurt,

16    whoever was involved.  I don't -- I didn't look back into

17    it.  I don't like looking at it, and stuff like that.  But I

18    just know he is everything that I want, and I want him to

19    come home to us.

20    THE COURT:  All right.  I appreciate that.

21    Thank you.

22    MR. COCHRAN:  Your Honor, the last thing I would

23    offer to the Court is that Mr. Tenney, with his current life

24    situation, the reforms that he has made over the last 17

25    months, his total lack of criminal history -- our request is

1    for a probationary or home detention sentence; and we

2    genuinely believe that that is a punishment that is not

3    greater than necessary for Mr. Tenney to exact justice, but

4    it does compound the extreme consequences that he has

5    already faced.  So I would ask Your Honor to vary from the

6    guidelines that Your Honor stated earlier and give a

7    noncustodial sentence.  And we also believe that that would

8    be in line -- more in line with his codefendant who received

9    a similar sentence, but with far less consequences in terms

10   of criminal convictions; and the very recent case from just

11   down the hallway, a man was in the Capitol for 80 minutes

12   plus, almost an hour and a half, right on the front lines of

13   Capitol Police in riot gear, screaming at them, yelling at

14   them, and received probation and home detention.

15          We understand that every case is different.  But I

16   think that Mr. Tenney's presentation before you here, as a

17   person, is that a 48-month sentence is far in excess of what

18   is necessary to reflect his actions that day, and that a

19   much lower sentence would be far more appropriate.

20   Thank you.

21          THE COURT:  All right.  I appreciate that.

22          Mr. Tenney, I understand your situation today and

23   your family, and the tragedy that occurs by your going to

24   prison, being separated from them and causing the financial

25   difficulties that will be necessary.

1          On the other hand, when I look at the sentencing

2     guidelines and the sentencing procedure under Title 18,

3     3553(a) factors, I have to sentence you to reflect the

4     seriousness of the offense and promote respect for the law,

5     to provide just punishment, to afford adequate deterrence,

6     protect the public from any further crimes -- I don't

7     think you will be subject to any, hopefully -- provide you

8     with any needed educational, vocational training, et cetera.

9          In addition, I have to consider the following

10    factors:  The nature and circumstances of the offense, and

11    the history and characteristics of you.  We have discussed

12    that all along here, the nature and circumstances of the

13    offense in detail, and your history and background; the kind

14    of sentences available, I have guidelines that are not

15    binding on the Court, but are advisory only; and the

16    guidelines, as I have determined them, over the objection of

17    your counsel -- which you can appeal -- is 41 to 51 months.

18         Per the policy statements -- while I took into

19    account the policy statements of the interference with the

20    administration of justice, I have considered that;

21    obviously, any facts of this riot which we cannot dismiss.

22         There has been an awful lot of posturing by

23    political individuals, as well as some of the people accused

24    in this riot, that they did nothing wrong; that they're

25    exercising their First Amendment rights, and that they're

1    political prisoners -- all of which are false and

2    inappropriate.

3            I only invite them to watch the riot videos that

4    we see here every day, when we go through these cases, to

5    show how that is simply lies that they're proposing to try

6    to excuse their conduct or the people that they like --

7    their conduct; the need to avoid unwarranted sentencing

8    disparities among similarly-situated defendants -- that was

9    a bit of concern for me; and the need to provide

10   restitution, while part of the plea agreement provides that

11   in your plea agreement with the Court and the prosecution.

12           The Court is troubled because of the nature of the

13   sentence that you find yourself in because of the type of

14   offense where you have no serious prior criminal record

15   really at all and where a codefendant was given probation,

16   although his circumstances were somewhat different, he had a

17   misdemeanor plea which subjected him to six months -- it

18   makes it very different; and he had a different approach of

19   what he had done and how he acted thereafter, I will say.

20           One of the things that concerned me is -- I know

21   how you feel now, and your heartfelt concerns that you have

22   expressed today -- and that of your fiancée -- I accept as

23   true, what you believe today.  But in those days, you were

24   plotting to come up here -- plotting to, basically, have a

25   riot and try to take over the Capitol and to stop the

1    Electoral College proceeding -- in other words, to have a

2    revolution against the government of the United States --

3    and afterwards you continued that, at least for several

4    weeks, until the FBI came.

5            And your adjustment to where you are now obviously

6    didn't occur right away; it wasn't you suddenly realized

7    that you had done something really wrong and dangerous and

8    harmful to others until sometime later.

9            I am not going to recite the various concerns the

10   courts have expressed -- our judges have expressed about

11   what happened at the Capitol; it's a blight on our history

12   and our country that will never go away.

13           But that -- I am concerned about your conduct --

14   setting aside your physical conduct with the police, which I

15   think you had some.  But you're now saying you are opening a

16   door to help people who seem to be bothered by tear gas or

17   being pressed and crushed; people are trying to break in.

18   You are opening the door at one point and then having it

19   closed again by the police, and then going back a second

20   time to open it again and allowing a lot of people to come

21   in who subsequently caused damage -- that is direct support

22   on the riot.  Regardless of what you thought -- you think

23   you were doing at the time to help others, those are rioters

24   that came in; one attacked a police officer.  I mean,

25   it's -- there is no other way to consider what you did,

1    unfortunately.

2            I accept your fiancée's statement of what kind of

3    person you are now; she's gotten to know you.  I am glad to

4    see this change; you have a new family and are starting life

5    over.  But there is a sentence you have to serve for this

6    kind of action.  We cannot let this go and simply tell

7    people:  You have a slap on the wrist; it's okay to riot,

8    it's okay to attack people.

9            What people don't realize sometimes -- you

10   mentioned it very briefly here, I am glad to see that.  I

11   generally don't hear from the rioters who plead guilty

12   before me and come in -- that they're sorry about the people

13   that got hurt.  I think four police officers committed

14   suicide within a few weeks of the riot, some very shortly

15   after the riot; they were under attack for hours.  I mean,

16   like a medieval attack where there was a hand-to-hand combat

17   going on and -- by the people they thought were loyal

18   Americans; and some of them just fell apart after that, it

19   destroyed them.  Many got destroyed psychologically and have

20   never returned to the police department again.

21           There are others that had -- almost 140 had

22   serious injuries and had to get treated, are still

23   recovering and never went back to work; one had a heart

24   attack, was seriously injured, and retired.

25           There was just a whole circumstance of people --

1    the people cowering in their offices hiding when the rioters

2    are marching down saying they are looking for people; they

3    are looking for Pelosi; they want to hang Pence.  They were

4    having to hide in closets for hours, very near these

5    rioters, thinking they're going to be killed.  I mean, the

6    harm that was done to other people and the harm done to our

7    country -- I don't think there is any way to pay for that --

8    recover from that.  It just -- I cannot express, I think,

9    strong enough how bad this conduct was by the rioters.

10            So I am going to sentence you as follows -- I am

11    going to vary downward a little bit from the sentence in the

12    guidelines because I think the disparity in sentencing

13    bothers me a little bit in some of these sentences.  I think

14    the judges have been struggling to be consistent in their

15    sentencing.  Everyone is a little bit different; people have

16    different circumstances and backgrounds.  But I do not see

17    any way you can be given probation and let out; I simply

18    cannot agree to that.

19            The entire sentence right now would be normally

20    41, as I said, to 51 months.  I am going to sentence you to

21    a period of a term in jail; it's going to be somewhat less

22    than that because, again, I think a variance is warranted

23    under the disparity of sentencing and issues I have with

24    some of the sentences that were given to some of these other

25    people.

1          I am going to sentence you as follows -- you are

2     going to have to serve this.  Your counsel hasn't requested

3     it, but I am also going to order you to voluntarily report

4     to prison when you are ordered to do so.

5          MR. COCHRAN:  Thank you, Your Honor.

6          THE COURT:  And I am going to ask that that occur

7     after January 1 -- to the prison system.  I haven't given

8     the government a chance to object to that; but I am going to

9     do that anyway because I don't think you are a danger of

10    escape or any problem.  You need to settle your finances and

11    your family before your term of imprisonment begins.  If you

12    don't report when ordered, that's a crime of escape, and

13    then you have another five-year felony on top; so I trust

14    that you will do so.

15         Under the Sentencing Reform Act of 1984 and in

16    consideration of the provisions of the Title 18, U.S.C.

17    3553(a) factors I have discussed, and the advisory

18    sentencing guidelines, it is the judgment of the Court that:

19    George Amos Tenney, III, is committed to the custody of the

20    Bureau of Prisons for a term of 36 months, that's three

21    years -- that's below the low range of the guidelines and

22    far below the high range -- as to each count, Count 1 and

23    Count 2, to be served concurrently, for a total of 36

24    months.

25         You are further sentenced to serve a 36-month term

1    of supervised release once you are released from prison.

2         Now, on each count -- they will be served

3    concurrently to the other.

4         In addition, there is a special assessment of $100

5    per felony conviction, for a total of $200, under Title 18,

6    3013.

7         Now, on supervised release -- that means you'll

8    get out of prison -- you will still have to report to a

9    probation officer as required; but they can help you get

10   employment.  They can help you with any medical care, any

11   other problems that you have, as long as you follow the

12   terms of supervised release.

13        The supervision -- we'll have the mandatory

14   conditions and discretionary conditions recommended by the

15   probation officer in Part D of the sentencing options, which

16   are imposed to establish a basic expectation for your

17   conduct.

18        They will include:  You can't commit any other

19   crimes.  You must not unlawfully possess a controlled

20   substance.  You must refrain from unlawful use of a

21   controlled substance.  You would submit to drug tests within

22   15 days once you are placed on supervision, and two periodic

23   tests thereafter.  You must cooperate with the collection of

24   DNA evidence as directed by the probation office.  You will

25   make restitution as ordered as part of this sentence.

1        The following are special conditions:

2        One, you must make restitution to the Architect of

3    the Capitol in the amount of $2,000.  The Court determines

4    you do not have the ability to pay interest and, therefore,

5    waives interest and penalties on the balance.

6        Now, I didn't get any financial information in the

7    presentence report; you didn't produce any.  $2,000 was

8    agreed upon as part of the plea agreement in this case.

9        I am not going to impose a fine.  There had been a

10   request to impose a fine.  I don't know your circumstances

11   in detail, your financial circumstances.  It seems to me

12   that you are facing a difficult problem for the next three

13   years with income and, therefore, I do not think you will

14   have any ability to pay the $2,000 fine that had been

15   recommended.

16       The financial penalty, that is, the $2,000

17   restitution -- you will have to continue to pay the court

18   that as you are able, and you must notify the Court of any

19   changes in your economic circumstances, as well as your

20   current address, et cetera.

21       I think you should pay -- unless the circumstances

22   change dramatically because you will lose your income -- pay

23   $100 a month over the period of time it would take to pay

24   the $2,000 restitution.  You may get that adjusted as your

25   income problems become more severe and by working with the

1    probation office.  But you do have to provide the probation

2    office with any requested financial information and

3    authorize the release of that to them.  As part of that, you

4    should not incur new credit charges or additional lines of

5    credit without the approval of a probation officer; this is

6    when you're on supervised release.

7          Substance abuse testing.  Obviously, you will get

8    tested when you get out of prison; and they can also request

9    further tests if they think it's necessary.

10         Once you are released from prison -- I want to

11   talk to Mr. -- let me talk to you about one matter here on

12   the sentencing, I don't think it may be necessary.

13         MR. WALTERS:  Yes, sir.

14         THE COURT:  Any suggestion for the reentry

15   progress hearing?

16         MR. WALTERS:  Your Honor, that's at your discretion.

17         THE COURT:  I don't think --

18         MR. WALTERS:  We put that in there in case you

19   were wanting to transfer jurisdiction.

20         THE COURT:  I am going to transfer jurisdiction.

21         MR. WALTERS:  So we would recommend a hearing just

22   so you can assess the situation after 36 months, and then

23   determine -- make the transfer of jurisdiction then.

24         THE COURT:  All right.  I will require a reentry

25   progress hearing 60 days after release from prison.  You

1    will appear before a court for a reentry progress hearing.

2    The probation officer in the district where you are

3    supervised will submit a progress report to the Court within

4    30 days of the commencement of supervision upon --

5            MS. LOEB:  Your Honor.

6            THE COURT:  Yes.

7            MS. LOEB:  Your Honor, I just wanted to note that

8    the government would prefer that the Court retain

9    jurisdiction just because Your Honor and the U.S. Attorney's

10   Office here have greater familiarity with the defendant's

11   circumstances, so I just wanted to note that objection for

12   the record.

13           THE COURT:  Right.  Yes.  I am going to transfer

14   it because he is not going to be living here; it's not going

15   to be helpful if he is not here.

16           All right.  Within 30 days of the commencement of

17   supervision, upon release of the progress report, the Court

18   will determine if your appearance is required.

19           As to the payments for restitution, they are paid

20   to the Clerk of the Court of the United States District

21   Court for reimbursement to the following victim:  Architect

22   of the Capitol, in the amount of loss of $2,000.

23           Now, there is a separate $200 fine -- assessment

24   for $100 per conviction; that's payable immediately to the

25   Clerk of the Court of the United States District Court here

1    in D.C.  Again, you will have to work with your probation

2    officer about getting those paid; and the Clerk of the Court

3    here can tell you how to do that.

4           I will allow the probation officer to release the

5    presentence report to appropriate agencies, other probation

6    offices in the district where you may be residing to carry

7    out the sentence of the Court.

8           All right.  So the sentence is that.

9           You have a right to appeal the sentence if I

10   imposed a longer imprisonment than the statutory maximum,

11   which I did not -- it's a much greater maximum -- or if I

12   departed upward from the guideline range that I found

13   applied; I did not.

14          I did, however, overrule an objection to the

15   guideline range; so I gave you a longer range than if I

16   accepted the guideline range your counsel suggested, and you

17   have a right to appeal that.

18          Additionally, under 28 U.S.C. 2255, you have a

19   right to challenge this conviction or the sentence imposed

20   if you find new and currently unavailable information that

21   becomes available to you that you don't know about now or if

22   you claim you received ineffective assistance of counsel,

23   that is, not good legal advice in entering a plea of guilty,

24   or the sentence; and the cost of any appeal can be waived.

25          Now, so you understand -- I am going to advise you

1   again that -- I am ordering that you will be allowed to

2   voluntarily report to prison when advised to do so.  I am

3   going to request it be after January 1.  That means the

4   prison system, the Department of Justice, will notify you in

5   writing at your address -- which I assume is a good

6   address -- when you have to report and where you have to

7   report.  They will probably give a prison somewhere --

8   perhaps in your range, where you live, so your family can

9   see you, et cetera.

10           With your skills, I think you will probably do

11  well in prison as it is -- with what you have; you may,

12  hopefully, be able to help other people with those skills

13  that you have.  That will be the sentence of the Court.

14           Mr. Walters, do you need anything else?

15           MR. WALTERS:  No, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Anything else from counsel?

18           MS. LOEB:  The government moves to dismiss

19  Counts 3 through 9 of the indictment.

20           THE COURT:  All right.  All remaining counts in

21  the indictment, except for these two counts, will be

22  dismissed with the motion of the government.

23           All right.  Thank you, Counsel.  I appreciate your

24  work.

25           MR. COCHRAN:  Thank you, Your Honor.

1          (Whereupon, the proceeding concludes, 3:28 p.m.)

2                          **CERTIFICATE**

3

4          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

5     certify that the foregoing constitutes a true and accurate

6     transcript of my stenographic notes, and is a full, true,

7     and complete transcript of the proceedings to the best of my

8     ability.

9

10          This certificate shall be considered null and void

11     if the transcript is disassembled and/or photocopied in any

12     manner by any party without authorization of the signatory

13     below.

14          Dated this 5th day of January, 2023

15          /s/ Elizabeth Saint-Loth, RPR, FCRR
           Official Court Reporter
16

17

18

19

20

21

22

23

24

25